1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RAMIRO LEON, JR,                    No.  2:12-cv-2559 JAM GGH P

12              Petitioner,

13        v.                             FINDINGS AND RECOMMENDATIONS;
                                         ORDER
14   RON BARNES,

15              Respondent.

16

17

18   *Introduction and Summary*

19         Petitioner, Ramiro Leon, seeks habeas corpus review of his conviction for:

20   Deliberate, premeditated attempted murder with firearm, great bodily injury and gang

21   enhancements; Discharge of a firearm causing great bodily injury with gang enhancement;

22   Shooting at an occupied automobile with gang enhancement; Malicious discharge of a firearm

23   from a vehicle with gang enhancement and enhancement for great bodily injury.

24         As corrected by the Court of Appeal, petitioner was sentenced on his conviction for

25   attempted, premeditated murder with a gang enhancement to life imprisonment with a 15 year

26   minimum parole eligibility, and the firearm enhancement added an additional 25 years to life.

27   / / /

28
                                          1

Several claims are made, which are detailed below.  However, none of them ultimately has merit.  The petition and its supplement should be denied.[1]

*Background Facts*

In the AEDPA context of this petition, the facts as found by the Court of Appeal are important:

> There are over 700 validated gang members in Woodland.  Because gang members are most active between the ages of 14 and the late 20's, gangs are a problem in high schools.  The predominant gang problem in Woodland stems from the number of Nortenos and Surenos, with Nortenos outnumbering Surenos.  The governing body for Nortenos is the prison gang Nuestra Familia, while the governing body for Surenos is the prison gang Mexican Mafia; the two gangs were formed as rivals.  The parties stipulated that both Nortenos and Surenos qualify as criminal street gangs under section 186.22.

> Gang life is all about preserving one's reputation.  To this end, no act of disrespect can go unanswered or the member, and the gang, loses credibility.  There are no levels of disrespect; any act must be answered.  Gangs equate fear with respect and believe in street justice by retaliation.  A member gains status in the gang by committing crimes.  Drive-by shootings are common between Surenos and Nortenos, but Surenos consider them cowardice and an edict from the Mexican Mafia declares them not allowed.

> East Side Trece or EST is the prominent group of Surenos in Woodland.  One has to earn rank to get a gang tattoo.  At the time of the shooting, defendant was bald and had several tattoos on his head.  These included "Sur," "EST," "530," and "Fuck the World."  The area code for Woodland is 530 and it is common for gang members to have tattoos of their area code.  Defendant was an active member of the Surenos.

> Defendant attended Cache Creek High School.  The bus from the high school stopped near Campbell Park.  That area is known as Norteno turf.  On the school bus, Nortenos sit in back and the Surenos in front.  On the day of the shooting, the bus was full and there was a lot of yelling and clay was thrown.  There were always problems on the bus, but that day it got out of control.  At Fourth Street, a group met the bus and someone spit on it.  They talked about meeting at Campbell

---

[1]  The claims of this habeas corpus petitions are contained in the Petition, ECF No. 1 and the Supplement to the Petition, ECF No. 17.  For ease of reference, the undersigned will simply refer to the "petition."

2

Park to fight.

B.C., a Cache Creek student who associated with Surenos, saw defendant and two others walking towards Campbell Park; they asked for a ride. Some other Surenos went to the park in a red Scion. When the group of Surenos got to the park they did not fight because there were too many people and they would get jumped.

Defendant said he had a gun and B.C. said, "let's go get it." Defendant got his gun and said he wanted "[t]o do a drive-by." He claimed he was going to shoot in the air. Since B.C. did not want to drive defendant with the gun, she called R.R. R.R. had a pearl white Chrysler 300. The car has tinted windows. The group wanted defendant to go with R.R. because her car had darker windows. Defendant wore black with a blue bandanna across his face. He got in the rear passenger seat of the Chrysler.

J.S. drove her green Honda to the park and stayed inside. J.Z. got off the school bus at Campbell Park as usual. He was going to walk home with a friend.

A red Scion drove around the park a few times; someone in the car threw gang signs. Following the red car was R.R.'s white Chrysler. A male who came with J.S. threw a brick to get the cars to stop. The rear passenger window of the Chrysler opened, and defendant fired several shots. He said, "EST" and that he would do it again.

The Chrysler was only a few feet from J.S.'s car when the shots were fired. J.Z. was standing nearby and was shot in the hip. He was in the hospital two days; a bullet was lodged in his pelvis. The parties stipulated his injuries constituted great bodily injury. Bullets hit J.S.'s car. A bullet hit the driver's side of the windshield and damaged the dashboard. There was also a bullet on the driver's side at the rear of the car.

Shortly after the shooting a police officer who worked as a school resource officer contacted defendant with a group of known Surenos. The officer did not recognize defendant and asked him where he was from. Defendant replied he had recently moved from L.A.

In the days after the shooting a teacher's aide noticed eighth grader J.G. appeared nervous and upset. J.G. told the aide her brother's friend did the shooting. After the mandatory report to the principal, J.G. was interviewed by the police. J.G. told the police that defendant came to her house and said he wanted to get out of town. Her cousin asked defendant about the gun; he said the gun and the gloves he used

3

1   were "out of here."  Defendant said the shooting occurred at Campbell Park; he
2   was with a lot of people, they saw a lot of Nortenos and he started shooting.  He
    wanted to see a newspaper to read about the shooting.  He said he did not care if
3   they got him because they had no proof it was him.

4   At trial, J.G. denied she heard defendant talk about the shooting. She claimed this
5   interview was a lie.

6   After the shooting, R.R. threw away four bullets she found in the car.  A few
7   months later she had the Chrysler painted another color.  R.R.'s older brother, who
    had been a Sureno but claimed he stopped once he had kids, confronted defendant.
8   He was angry that defendant had gotten his sister in trouble, especially since his
9   mother had health issues.  Defendant said, "It happened, it happened."  The brother
    told defendant he was not supposed to do drive-bys.  Defendant replied, "I had to
10  do it."

11

12   People v. Leon, 2011 WL 1620651 (Cal. App. 2011)

13  *Issues*

14      Petitioner raises several issues in the petition:

15      1.  Insufficient Evidence With Respect to Deliberate, Premeditated Attempted Murder

16      2.  Special Jury Instruction Error

17      3.  Jury Instruction Error (CALCRIM 358)

18      4.  Griffin Error

19      5.  Cumulative Error

20      6.  Ineffective Assistance of Appellate Counsel (Failure to Raise Grounds 2, 3, 4, 5 on

21  appeal, including "federalizing" the claims)

22      7.  Ineffective Assistance of Trial Counsel (Failure to Communicate Plea)

23      Claims 3, 4 and 5 were withdrawn in the traverse.

24  *Legal Standards*

25      A.  AEDPA

26      All of petitioner's claims were decided on the merits, either on direct review (ground 1) or

27  on petition for habeas corpus (remaining claims).  Therefore the AEDPA standards are in full

28  play.

4

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . could

5

1   have supported[] the state court's decision; and then it must ask whether it is possible fairminded

2   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

3   decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires

4   considering the rule's specificity.  The more general the rule, the more leeway courts have in

5   reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this

6   standard, which "stops short of imposing a complete bar of federal court relitigation of claims

7   already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

8   strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.,

9   citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

10          The undersigned also finds that the same deference is paid to the factual determinations of

11   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

12   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

13   decision that was based on an unreasonable determination of the facts in light of the evidence

14   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

15   2254(d)(2) in a manner different from that same word as it appears in

16   § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

17   same record could not abide by the state court factual determination.  A petitioner must show

18   clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

19   U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

20          The habeas corpus petitioner bears the burden of demonstrating the objectively

21   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

22   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

23   show that the state court's ruling on the claim being presented in federal court was so lacking in

24   justification that there was an error well understood and comprehended in existing law beyond

25   any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787.  "Clearly

26   established" law is law that has been "squarely addressed" by the United States Supreme Court.

27   Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

28   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

6

1   Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

2   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

3   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

4   established law when spectators' conduct is the alleged cause of bias injection).  The established

5   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

6   controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

7   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

8        The state courts need not have cited to federal authority, or even have indicated awareness

9   of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct. at 365.

10  Where the state courts have not addressed the constitutional issue in dispute in any reasoned

11  opinion, the federal court will independently review the record in adjudication of that issue.

12  "Independent review of the record is not de novo review of the constitutional issue, but rather, the

13  only method by which we can determine whether a silent state court decision is objectively

14  unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

15       Finally, if the state courts have not adjudicated the merits of the federal issue, no

16  AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

17  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).  However, when a state court decision on a

18  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

19  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

20  merits.  Johnson v. Williams, ___ U.S. ___, 133 S.Ct. 1088, 1091 (2013).

21       B. Ineffective Assistance of Counsel

22       The clearly established federal law for ineffective assistance of counsel claims is

23  Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

24  must show that (1) his counsel's performance was deficient and that (2) the "deficient

25  performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

26  her representation "fell below an objective standard of reasonableness" such that it was outside

27  "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

28  quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

7

1   fair trial, a trial whose result is reliable.'" Richter, 131 S. Ct. at 787-88. (quoting Strickland, 466

2   U.S. at 687).

3       A reviewing court is required to make every effort "to eliminate the distorting effects of

4   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

5   conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669; see Richter, 131 S.

6   Ct. at 789.  Reviewing courts must "indulge a strong presumption that counsel's conduct falls

7   within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  There

8   is in addition a strong presumption that counsel "exercised acceptable professional judgment in

9   all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

10  Strickland, 466 U.S. at 689).  This presumption of reasonableness means that the court must "give

11  the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of

12  possible reasons [defense] counsel may have had for proceeding as they did." Cullen v.

13  Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations

14  omitted).

15      Defense counsel has a "duty to make reasonable investigations or to make a reasonable

16  decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  Counsel

17  must, "at a minimum, conduct a reasonable investigation enabling him to make informed

18  decisions about how best to represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th

19  Cir. 1995) (quoting Sanders, 21 F.3d at 1456 (internal citation and quotations omitted).  See also

20  Porter v. McCollum, 558 U.S. 30, ___, 130 S. Ct. 447, 453 (2009) (counsel's failure to take "even

21  the first step of interviewing witnesses or requesting records" and ignoring "pertinent avenues for

22  investigation of which he should have been aware" constituted deficient performance).  On the

23  other hand, where an attorney has consciously decided not to conduct further investigation

24  because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.

25  See Siripongs v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998); Babbitt v. Calderon, 151 F.3d

26  1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not

27  to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"

28  Wiggins v. Smith, 539 U.S. 510, 533 (2003) (quoting Strickland, 466 U.S. at 691).

1      A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time

2  of counsel's conduct.'" <u>United States v. Chambers</u>, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting

3  <u>Strickland</u>, 466 U.S. at 690).  <u>See also</u> <u>Rhoades v. Henry</u>, 638 F.3d 1027, 1036 (9th Cir. 2011)

4  (counsel did not render ineffective assistance in failing to investigate or raise an argument on

5  appeal where "neither would have gone anywhere").

6      Prejudice is found where "there is a reasonable probability that, but for counsel's

7  unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466

8  U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

9  outcome." <u>Id.</u>  "The likelihood of a different result must be substantial, not just conceivable."

10  <u>Richter</u>, 131 S. Ct. at 792.

11      Under AEDPA, "[t]he pivotal question is whether the state court's application of the

12  <u>Strickland</u> standard was unreasonable." <u>Id.</u> at 785.  "[B]ecause the <u>Strickland</u> standard is a

13  general standard, a state court has even more latitude to reasonably determine that a defendant has

14  not satisfied that standard." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

15  *Discussion*

16      A. <u>Insufficiency of Evidence—Premeditated Attempted Murder</u>

17      Because petitioner can find some evidence that points away from premeditated, attempted

18  murder, he makes the mistake of opining that, therefore, the evidence was insufficient on that

19  point.  The correct legal standards for AEDPA insufficiency of evidence claims follow.

20      When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is

21  available if it is found that upon the record evidence adduced at trial, viewed in the light most

22  favorable to the prosecution, no rational trier of fact could have found "the essential elements of

23  the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct.

24  278 (1979).  Jackson established a two-step inquiry for considering a challenge to a conviction

25  based on sufficiency of the evidence. <u>U.S. v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir.2010) (en

26  banc).  First, the court considers the evidence at trial in the light most favorable to the

27  prosecution. <u>Id.</u>, citing <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. 2781.  "'[W]hen faced with a record of

28  historical facts that supports conflicting inferences,' a reviewing court 'must presume-even if it

9

1  does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in

2  favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at

3  326, 99 S. Ct. 2781.

4         "Second, after viewing the evidence in the light most favorable to the prosecution, a

5  reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

6  rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id.,

7  quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781.  "At this second step, we must reverse the

8  verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

9  finders would have to conclude that the evidence of guilt fails to establish every element of the

10  crime beyond a reasonable doubt."  Id.

11        Put another way, "a reviewing court may set aside the jury's verdict on the ground of

12  insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v.

13  Smith, ___ U.S. ___, 132 S.Ct. 2, 4 (2011).  Sufficiency of the evidence claims in federal habeas

14  proceedings must be measured with reference to substantive elements of the criminal offense as

15  defined by state law.  Jackson, 443 U.S. at 324 n.16.

16        "Jackson leaves juries broad discretion in deciding what inferences to draw from the

17  evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic

18  facts to ultimate facts.'"  Coleman v. Johnson, ___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) (per

19  curiam) (citation omitted).  "'Circumstantial evidence and inferences drawn from it may be

20  sufficient to sustain a conviction.'"  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.1995) (citation

21  omitted).

22        Superimposed on these already stringent insufficiency standards is the AEDPA

23  requirement that even if a federal court were to initially find on its own that no reasonable jury

24  should have arrived at its conclusion, the federal court must also determine that the state appellate

25  court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable

26  determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).  Because this case is governed by

27  the AEDPA, this court owes a "double dose of deference" to the decision of the state court.  Long

28  v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 960 (9th

1    Cir. 2011).

2            In reviewing this claim, the California Court of Appeal found:

3    Section 664, subdivision (a), provides the usual sentence for attempt is one-half
4    the sentence for the crime attempted. "However, if the crime attempted is willful,
     deliberate, and premeditated murder, as defined in Section 189, the person guilty
5    of that attempt shall be punished by imprisonment in the state prison for life with
6    the possibility of parole." (§ 664, subd. (a).)

7    "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate'
8    means 'formed or arrived at or determined upon as a result of careful thought and
     weighing of considerations for and against the proposed course of action.'
9    [Citation.] The process of premeditation and deliberation does not require any
10   extended period of time. 'The true test is not the duration of time as much as it is
     the extent of the reflection. Thoughts may follow each other with great rapidity
11   and cold, calculated judgment may be arrived at quickly....' [Citations.]" (*People
12   v. Mayfield* (1997) 14 Cal.4th 668, 767.)

13   Under the tripartite test of *People v. Anderson* (1968) 70 Cal .2d 15, 26–27
14   (*Anderson*), we focus on three categories of evidence of premeditation and
     deliberation: (1) planning activity prior to the killing; (2) evidence of motive to
15   kill, derived from defendant's prior relationship or conduct with the victim; and (3)
16   the manner of killing, indicating some preconceived design to kill.

17   Here there was sufficient evidence from which a rational trier of fact could
18   conclude defendant's shooting was deliberate and premeditated. The evidence
     supporting premeditation and deliberation falls primarily within the first two
19   categories identified in *Anderson, supra*, 70 Cal.2d 15, planning activity and
20   motive.

21   When he originally went to the park, defendant was unarmed. Seeing the number
22   of Nortenos present, he decided to retrieve his gun. That act gave him time to
     consider whether and how to use lethal force. (*People v. Millwee* (1998) 18 Cal.4th
23   96, 134–135.) Bringing a weapon to the scene of the crime shows planning
24   activity. (*People v. Horning* (2004) 34 Cal.4th 871, 902; *see also People v.
     Wharton* (1991) 53 Cal.3d 522, 547 [evidence that defendant either retrieved
25   hammer in advance or went to garage to obtain hammer and kill victim was
26   indicative of planning activity]; *People v. Morris* (1988) 46 Cal.3d 1, 23
     ["Defendant's possession of a weapon in advance of the killing, and his rapid
27   escape to a waiting car moments afterwards, amply support an inference of
28   planning activity"], disapproved on other points in *People v. Sassounian* (1995) 9

11

1    Cal.4th 535, 543, 545, fns. 5 & 6.)

2

3    Defendant expressed his intention to "do a drive-by," from which the jury could
     infer he planned to shoot someone. While B.C. testified defendant said he planned
4    to shoot only in the air, he could have, as the trial court found, masked his true
     intention from his companions or have changed his mind. Further, his companions
5    may have understood his true intentions, as shown by their reluctance to have him
     and the gun in their cars and their involving R.R. instead. At trial, B.C. may have
6    tried to downplay their knowledge (and culpability) despite admitting the
     precautions taken to avoid detection. B.C. was to drive close to R.R. to "[c]over
7    her plates," so the license plate could not be identified. Defendant covered his face
     with a bandanna and went in the car with tinted windows so he could not be
8    identified.
9

10   In addition to planning activity, there was strong evidence of motive to support
     premeditation. Premeditation is often found in gang shootings based on the motive
11   of intense gang rivalry. (*People v. Martinez* (2003) 113 Cal.App.4th 400, 413.) "A
     studied hatred and enmity, including a preplanned, purposeful resolve to shoot
12   anyone in a certain neighborhood wearing a certain color, evidences the most cold-
     blooded, most calculated, most culpable, kind of premeditation and deliberation."
13   (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001.) The gang expert testified the
     shooting was done for the benefit of, and in association with, the gang. During the
14   shooting, defendant announced both his gang affiliation, "EST," and that he would
     do it again.
15

16

17   Defendant contends the cases that have found deliberation based on gang motive
     are distinguishable because here defendant was provoked by the throwing of the
18   brick. The evidence, however, was that the brick was thrown at the red Scion, not
     at the white Chrysler. At most, the thrown brick was an act of disrespect by a rival
19   gang that defendant was fully prepared to address as he was masked and armed.
     (*See In re Sergio R.* (1991) 228 Cal.App.3d 588, 597 [retaliatory drive-by shooting
20   provides evidence of deliberation and premeditation].) There is substantial
     evidence of deliberation and premeditation.
21

22

23

24   People v. Leon, at * 3-4.

25        The undersigned has reviewed the trial transcript, and finds the appellate court's rendition

26   very accurate.  The cars in petitioner's entourage scoped out the area where the shooting would

27   take place.  RT  177, 178, 215.  Such scouting might well indicate planning.  Persons in the car

28

1    threw gang signs, RT 179,-- again evidence establishing motive, and according to the gang

2    expert—planning.  The covered plates and covered face, RT 646, 783, are highly indicative that

3    petitioner planned a major crime and not a mere boastful display of bravado. Of course, as noted

4    by the Court of Appeal and the undersigned as well, petitioner's arming himself, and proclaiming

5    he was ready to perform a "drive-by" leaves little doubt that planning a shooting at someone was

6    contemplated.  A witness did make the statement that petitioner planned only to shoot in the air,

7    but the jury was free to disbelieve this prepatory statement on its face (or if made, perhaps only to

8    falsely encourage the others to join in a simple show of force), and to rely on the circumstantial

9    evidence.

10       Under the AEDPA standards, the evidence of premeditation/deliberation, although not

11   overwhelming, and perhaps clouded by the uncertainty in the law concerning the validity of a

12   "kill-zone" attempted murder, see next section, was certainly sufficient under the instructions

13   given by the trial court.  The California Court of Appeal was not unreasonable in determining so.

14       B. The Kill Zone Instruction (Claim 2)

15       Petitioner claims that the trial court erred in giving a "kill-zone" instruction under

16   California law which gave the jury license to find attempted murder of a specific person because

17   petitioner intended to kill "someone", i.e., an unidentified person, in an undefined "kill-zone."

18       Claim 2, involves a "straight" federal jury instruction claim of error, and one of

19   ineffective assistance of appellate counsel in not raising the claim on direct review (Claim 6).  To

20   the extent that respondent asserts that errors in state law cannot constitute a cognizable claim,

21   respondent is correct.  See Wilson v. Corcoran, 562 U.S.1, 5, 131 S. Ct. 13,16 (2010); Estelle v.

22   McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); see

23   also Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11, 95 S. Ct. 1881 (1975) (federal courts will not

24   review an interpretation by a state court of its own laws unless that interpretation is clearly

25   untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of

26   rights guaranteed by the Constitution).

27       In order for the trial court's alleged erroneous instructions to warrant federal habeas relief,

28   petitioner must demonstrate that he suffered a violation of due process.  See Estelle, 502 U.S. at

1    72 ("The only question for us is 'whether the ailing instruction by itself so infected the entire trial

2    that the resulting conviction violates due process.'") (quoting Cupp v. Naughten, 414 U.S. 141,

3    147, 94 S. Ct. 396, 38 L.Ed.2d 368 (1973).  That is, in order for relief to issue, a challenged jury

4    instruction "cannot be merely 'undesirable, erroneous,' or even 'universally condemned,' 'but

5    must violate some due process right guaranteed by the fourteenth amendment.'"  Cupp, 414 U.S.

6    at 146.  See also Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir.1992).  The Due Process

7    Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the

8    fundamental elements of fairness in a criminal trial.'"  Rivera v. Illinois, 556 U.S. 148, 158, 129

9    S. Ct. 1446 (2009) (quoting Spencer v. Texas, 385 U.S. 554, 563-64, 87 S. Ct. 648 (1967)).  The

10   Supreme Court has defined 'very narrowly' the category of infractions that violate fundamental

11   unfairness.  Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668 (1990).

12        In order to establish the necessary due process violation, in an AEDPA context, petitioner

13   must show that the United States Supreme Court has found such a violation under similar

14   circumstances.  Petitioner has not done so, and the undersigned is unaware of any such case.

15   Extrapolations of generally worded Supreme Court holdings to the present, specific situation in

16   this case are disfavored.  Thus, petitioner states no "straight claim" of due process denial in the

17   giving of the "kill-zone" instruction in that no established precedent of the Supreme Court finds it

18   to be so.  Moreover, even if this court strayed off into its own due process analysis, i.e., did the

19   instruction error in state law cause a fundamental unfairness in petitioner's trial,—for the reasons

20   expressed below, there was no unequivocal state law error in the wording of the instruction given

21   at petitioner's trial. [2]

22        Ineffective assistance of counsel claims *may* rely on AEDPA prejudicial, but nevertheless

---

[2]  The undersigned understands that a jury instruction based on state law can be accurately set forth as a matter of state law, yet still be offensive to the Constitution.  However, and again, if this is to be so, the Supreme Court must declare it so.  AEDPA does not give the lower courts license to take some general due process principle and extrapolate it to any situation.  And, the notion of a "kill-zone" per se for attempted murder does not implicate an area of fundamental fairness in a criminal prosecution.

Petitioner's theory here is not that "kill-zone" instructions are *per se* violative of fundamental fairness—rather, he believes that the trial court erred under state law in giving the instruction at issue in this case.

14

1   state law errors, by defense or appellate counsel.  The failure by counsel to object or argue a

2   manifest error of state law is just as much a failure of advocacy as is failing to do the same with

3   respect to asserted federal constitutional error.  See e.g., Jones v. Wood, 207 F.3d 557, 562 (9th

4   Cir. 2000).  Because Claim 6 asserts that all the described errors in Claims 2, 3 and 5 were also

5   ineffective assistance of appellate counsel errors, the alleged state court error for Claim 2 will be

6   analyzed under this latter rubric here.

7           As it turns out, petitioner has a far from frivolous claim.  No reasoned opinion exists for

8   the claim of ineffective assistance in this case, so its essence must be fleshed out here.  The

9   undersigned finds respondent's background discussion in the Answer helpful and accurate and

10   will draw on it for the background of the claim.

11          Petitioner was charged with personally firing a gun with the intent to take a human life.
12   The trial court initially instructed the jury as follows:

13          The defendant is charged in Count 1 with attempted murder. To
            prove that the defendant is guilty of attempted murder, the People
14          must prove that, one, the defendant took at least one direct but
            ineffective step towards killing another person, and two, the
15          defendant intended to kill that person.

16          A direct step is one that goes beyond planning to commit murder to
            obtaining or arranging for something needed to commit murder.
17
            A direct step is one that goes beyond planning or preparation and
18          shows that a person is putting his or her plan into action.

19          A direct step indicates a definite and unambiguous intent to kill. It
            is a direct movement toward the commission of the crime after
20          preparations are made. It is an immediate step that puts the plan in
            motion so that the plan would have been completed if some
21          circumstance outside the plan had not interrupted the attempt.

22          A person who attempts to commit murder is guilty of attempted
            murder even if after taking a direct step toward killing, he or she
23          abandons further efforts to complete the crime or his or her attempt
            fails or is interrupted by someone or something beyond his or her
24          control.

25          On the other hand, if a person freely and voluntarily abandons his
            or her plans before taking a direct step toward committing murder,
26          then that person is not guilty of attempted murder.

27   (RT 1162-63; CT 331.)

28

15

During jury deliberations, the court received a note from the jury foreperson regarding CALCRIM No. 600. (RT at 1252.) The note read:

> In Count One we are unclear as to the kill zone section of Part 2 of Count One.
>
> Quote "In order to convict the defendant of the attempted murder of [J.Z.], the People must prove that the defendant either intended to kill [J.Z.], or intended to kill <u>anyone</u> within the kill zone. If you have reasonable doubt whether the defendant intended to kill [J.Z.] or intended [J.Z.] by killing <u>everyone</u> in the kill zone, then you must find the defendant not guilty of attempted murder of [J.Z.]." We would like to know if this means the defendant had to intend to kill everyone for this to be attempted murder or if he only intend to kill someone in general [to be attempted murder.]"
>
> (CT at 369 (original underscoring and quotation marks); RT at 1252-53.)

In response to the jury's question, the court instructed the jury with the following revised version of CALCRIM No. 600:

> The defendant is charged in Count 1 with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that, one, the defendant took a direct but ineffective step toward killing another person, and two, the defendant intended to kill that person.
>
> A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.
>
> A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.
>
> A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.
>
> A person who attempts to commit murder is guilty of attempted murder even if after taking a direct step towards killing he or she abandons further efforts to complete the crime or his or her attempt fails or is interrupted by someone or something beyond his or her control.
>
> On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.

(RT at 1262-63; CALCRIM No. 600 [Attempted Murder].)

16

The court then instructed the jury with the following special instruction:

> *A defendant charged with attempted murder does not have to intend to kill everyone who was standing in a, quote, kill zone or, quote, zone of risk. A person who intends to kill someone can be guilty of attempted murder, even if the person had no specific target in mind. However, a person cannot be found guilty of attempted murder, unless he had the specific intent to kill a human being.*

(RT at 1263; CT at 360.)[FN 2] (emphasis added)

[Footnote 2]  The court indicated that the special instruction was based in part on <u>People v. Stone</u>, 46 Cal. 4th 131, 140-41 (2009).

Answer, ECF No. 33 at 24-25 (electronic pagination).

The attempted murder instruction here, as modified by the "kill-zone" addition set forth above, was an important instruction. There is no evidence that petitioner here had targeted a specific person. Rather, he was intent on performing a drive-by shooting targeting whomever might be available in terms of the rival gang, i.e., within his "kill-zone." California law is unclear at best, and confusing at worst, concerning attempted murders carried out by a random firing of a weapon into a crowd, i.e., no specific intended victim, and the precise parameters of a "kill-zone."

<u>People v. Bland</u>, 28 Cal. 4th 313, 329-330 (2002), attempted to define attempted murder and the intent required in what was both a contraction and seeming expansion in convictions for attempted murder in which bystanders were shot along with an intended victim. While it precluded the doctrine of transferred intent in such situations, it did permit concurrent intent. However, that intent was defined as the desire on the part of the perpetrator to kill *everyone* within a kill zone in order to achieve the death of the intended victim.[3]  However, the case left

---

[3]  The <u>Bland</u> court stated:

> The *Ford* court explained that although the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant

17

1    undefined those situations where no intended victim was identified, yet shots were purposefully

2    fired into a group.

3        People v. Stone, 46 Cal. 4th  131, 140 (2009), indicated that attempted murder *could* be

4    found for *anyone* in the "kill zone" as long as the defendant determined to kill *someone* in a group

5    within that zone, albeit the precise victim was unidentified.

6

7    who intends to kill A and, in order to ensure A's death, drives by a
     group consisting of A, B, and C, and attacks the group with
8    automatic weapon fire or an explosive device devastating enough to
     kill everyone in the group. The defendant has intentionally created a
9    'kill zone' to ensure the death of his primary victim, and the trier of
     fact may reasonably infer from the method employed an intent to
10   kill others concurrent with the intent to kill the primary victim.
     When the defendant escalated his mode of attack from a single
11   bullet aimed at A's head to a hail of bullets or an explosive device,
     the factfinder can infer that, whether or not the defendant succeeded
12   in killing A, the defendant concurrently intended to kill everyone in
     A's immediate vicinity to ensure A's death. The defendant's intent
13   need not be transferred from A to B, because although the
     defendant's goal was to kill A, his intent to kill B was also direct; it
14   was concurrent with his intent to kill A. Where the means employed
     to commit the crime against a primary victim create a zone of harm
15   around that victim, the factfinder can reasonably infer that the
     defendant intended that harm to all who are in the anticipated zone.
16   This situation is distinct from the 'depraved heart' [i.e., implied
     malice] situation because the trier of fact may infer the actual intent
17   to kill which is lacking in a 'depraved heart' [implied malice]
     scenario.' (*Ford v. State, supra*, 625 A.2d at pp. 1000-1001, fn.
18   omitted.)

19   California cases that have affirmed convictions requiring the intent
     to kill persons other than the primary target can be considered "kill
20   zone" cases even though they do not employ that term. In *People v.
     Vang* (2001) 87 Cal.App.4th 554, 563-565 [104 Cal.Rptr.2d 704],
21   for example, the defendants shot at two occupied houses. The Court
     of Appeal affirmed attempted murder charges as to everyone in
22   both houses-11 counts-even though the defendants may have
     targeted only one person at each house. 'The jury drew a reasonable
23   inference, in light of the placement of the shots, the number of
     shots, and the use of high-powered, wall-piercing weapons, that
24   defendants harbored a specific intent to kill every living being
     within the residences they shot up.... The fact they could not see all
25   of their victims did not somehow negate their express malice or
     intent to kill as to those victims who were present and in harm's
26   way, but fortuitously were not killed.' ( *Id.* at pp. 563-564; *see also
     People v. Gaither* (1959) 173 Cal.App.2d 662, 666-667 [343 P.2d
27   799] [defendant mailed poisoned candy to his wife; convictions for
     administering poison with intent to kill affirmed as to others who
28   lived at the residence even if not a primary target].)

1

2

3

4

5

> Now that we consider the question, we conclude that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person. One of *Bland's* kill zone examples involved a bomber who places a bomb on a commercial airplane intending to kill a primary target but ensuring the death of all passengers. We explained that the bomber could be convicted of the attempted murder of all the passengers. (*Bland, supra*, 28 Cal.4th at pp. 329–330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) But a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder.

6

7

8

9

10

See also People v. Ervin, 47 Cal. 4th 745, 786 (2009) ("The record at trial supports the inference that defendant expected the peace officers to come to his house, that he did not want to be arrested, and that he prepared an elaborate ambush, placing gas cans inside and outside the house and choosing a sniper location above the officers, to prevent being arrested. This plan, of course, would require the killing of all officers who were present.")

11

12

13

14

15

16

17

The problem, however, is that Stone and Ervin left the parameters of the kill-zone undefined, and seemingly made an attempted murder conviction easier to obtain in a situation where no specific intended target had been identified--- that is, shots were simply fired into a crowd of nameless targets, at least nameless to the defendant at the time of shooting. This left the various Court of Appeals to later argue whether the defendant had to really intend to wipe out all persons within a designated zone in order for some survivor to be deemed an attempted murder victim. Certain cases have found that to be a reversible error problem; others have not.

18

19

20

21

22

23

24

25

26

27

> First, the instruction here uses the term "kill zone" but does not adequately define it. The instruction purports to define "kill zone" as follows: "This zone of risk is termed the 'kill zone.'" (CALJIC No. 8.66.1.) That definition is informative only if the instruction elsewhere supplies a sufficiently precise meaning for the phrase "[t]his zone of risk"—if the jury wants to know "What zone of risk is the kill zone?", the instruction should provide the answer. But it does not. Rather, the phrase "[t]his zone of risk" in the definition of the term "kill zone" refers back to the first sentence of the instruction, which states: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk." (CALJIC No. 8.66.1.) So the only information given to the jury concerning "[t]his zone of risk," which is the "kill zone," is that it is "a particular zone of risk," which contains people whom the defendant "may also concurrently intend to kill." (CALJIC No. 8.66.1.) What zone is that? Where is it, and how far does it extend? How can the jury determine who is in it and who is not? The jury will search in vain through CALJIC No. 8.66.1 for answers to those questions. All that the instruction tells them is that the kill zone is a zone of risk (risk of what? physical injury? death? and does it matter whether the defendant created the risk?) that may or may not contain people whom the defendant intends to kill. Any crime scene contains an indefinite number of spatial regions ("zones") that fit that definition but that are not kill zones, as that term has been defined by the Supreme Court.

28

1    People v. Sek, 235 Cal. App. 4th 1388, 1394-1395 (2015).

2
3
4
5
> The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement. In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant specifically intends that everyone in the kill zone die. If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder.

6

7    People v. McCloud, 211 Cal. App. 4th 788, 798 (2012)

8         McCloud (and by extrapolation, Sek) were criticized by a case as "going too far" in

9    requiring a defined kill-zone where lethal force could be assumed to be used against all therein,

10   but this case has been taken up for review by the California Supreme Court.  People v. Canizales,

11   previously published at 229 Cal. App. 3d 820 (2014), review granted, 180 Cal. Rptr. 3d 99

12   (2014).  Thus, it appears that the "kill-zone" doctrine has yet to be finally fleshed out by the

13   California Supreme Court.

14        The jury instruction in this case quoted above left for speculation what was the "kill-

15   zone"—within 10 feet of the car, the entire park, anyone unlucky enough to be within the range of

16   the bullets fired no matter where they were located.  And, it is not specifically known just where

17   the shot victim was vis-à-vis petitioner's car, the pearl white Chrysler, and why the person shot

18   was considered to be within a "kill-zone."  The court rhetorically asks: Why were uninjured

19   persons in the vicinity not also victims of attempted murder?  Petitioner' point is far from

20   frivolous.

21        Given the unsettled law regarding kill-zone attempted murder, and the lack of any

22   specificity of that kill-zone in the instruction at issue, and the fact that petitioner had a legitimate

23   question under state law, one can question appellate counsel's failure to argue this point on direct

24   review.  However, the *sine qua non* for due process jury instruction error analyzed through the

25   prism of ineffective appellate assistance is that an error of state law was committed resulting in a

26   prejudicial unfairness to petitioner.  This prejudice presupposes in this case that an error in state

27   law was unequivocally made. [4]  Such cannot be the case when the status of California law on the

28   _____

[4]  Again, the undersigned recognizes a situation where established state law may implicate

20

1    precise subject is fluid.  That is, the trial court's supplemental instruction may reflect California

2    law, or it may not.  We do not know at this time.  Therefore, even assuming that counsel should

3    have argued petitioner's theory for the reasons expressed above, the undersigned can find no

4    Strickland prejudice, i.e., a verdict in which confidence has been lost, because it is not possible to

5    definitively determine the outcome under state law if such an argument had been made.  It

6    follows that the state courts' silent denial in habeas review of petitioner's ineffective assistance of

7    appellate counsel claim about an overbroad "kill-zone" were not AEDPA unreasonable in

8    arriving at a determination that no such prejudice occurred.

9         For the reasons expressed above, petitioner's straight claim of due process jury instruction

10   error in giving a "kill-zone" theory to the jury, and its related ineffective assistance of appellate

11   counsel, claim should both be denied.

12        C. The Absence of "Or Not" From CALCRIM 358 Which Asked the Jury to Determine

13           Whether Petitioner Uttered Certain Admissions (Withdrawn in the Traverse)

14        D. Griffin Error (Withdrawn in the Traverse)

15        E. Cumulative Error (Withdrawn in the Traverse)

16        F. Ineffective Assistance of Appellate Counsel

17        The ineffective assistance of appellate counsel claims have been analyzed in the previous

18   sections, and fail for the reasons set forth therein.

19        G. Ineffective Assistance of Trial Counsel (Plea Deal)

20        Petitioner is adamant that his trial counsel was offered a plea deal of 21 years with no "life

21   tail," but the problem is—both the prosecutor and defense counsel have filed declarations saying

22   that no such deal, or any deal without a life sentence, was ever offered.  See ECF 21 at 14 and

23   ECF No. 17 at 111(electronic pagination (Beede Declaration-defense counsel); and ECF 17 at

24   110 (electronic pagination) (Prosecutor Hamilton).  The deals offered by the prosecution, and

25   apparently there were some, are not specified by either defense counsel or the prosecutor.

26   Petitioner does not allege that he was unaware of these undescribed plea offers.  Petitioner has

27

28   fundamental unfairness, but that is not the issue here.

had access to his entire defense file (minus redacted personal information of witnesses),[5] and he has supplied nothing from that file which would corroborate his claim of a straight 21 year plea deal.  He argues that none of the deals which were offered are to be found in the case file; thus it is not surprising that the 21 year deal is not included either.  Petitioner believes that he is entitled to an evidentiary hearing in federal court, one that he did not receive in state court, on the basis of his allegations.

Specifically, petitioner's allegations are contained in ECF 17, electronic pages 34-36.  Petitioner alleges that he had several discussions about a plea deal with his counsel (Beede), but trial counsel finally told petitioner that he had "worked hard" and received a plea deal for 21 years.  Somewhat inconsistently, and despite the "hard work" involved in plea bargaining, counsel then implicitly recommended going to trial and told petitioner he had a good chance of winning at trial (60%), and petitioner ultimately determined, after talking with his mother, to not accept the deal.  Petitioner does not allege that his trial counsel urged him to accept the deal.  Petitioner also recounts what a co-defendant was offered in terms of a plea deal implying that he (petitioner) was being treated unfairly.  Petitioner now urges that he would have accepted the alleged 21 year deal had he been properly advised.

Petitioner's claim involving ineffective assistance about the plea deal was summarily denied in the state courts on petition for habeas corpus.

At the threshold, it is an alleged unreasonable determination of facts which is at issue here, i.e., the existence of a plea offer of a straight 21 years in the first instance.  There are two ways a petitioner may satisfy subsection (d)(2) of 28 U.S.C section 2254 (unreasonable determination of the facts).  Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox, 366 F.3d 992, 999–1001 (9th Cir. 2004).  The standard for determining whether the state court's fact finding process is insufficient requires the

---

[5]  The court previously ruled regarding discovery of his defense file.  ECF No. 42.

federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir.2004)).  The state court's failure to hold an evidentiary hearing does not automatically render its fact finding process unreasonable.  Id. at 1147.  However, the Ninth Circuit has explained that federal standards for determining when an evidentiary hearing is mandatory are a useful guide to determining the reasonableness of the state court's refusal to hold a hearing:

> A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question. See Earp, 431 F.3d at 1170 (noting that a state court is not required to hold an evidentiary hearing when it is possible to resolve the factual question "based on 'documentary testimony and evidence in the record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's fact-finding procedures were reasonable; this is a fact-bound and case-specific inquiry.

> Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166–67, 1169–70 (looking to Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474. More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. "'[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir.1998)).

> While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2) . . . . Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474–75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999.  Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within

1    its discretion in denying an evidentiary hearing, a state court's similar decision is probably
     not objectively unreasonable.
2

3    Accordingly, in considering a petitioner's argument that the state court's failure to hold an
     evidentiary hearing rendered its factual findings unreasonable, we may first consider
     whether a similarly situated district court would have been required to hold an evidentiary
4    hearing. *See Earp*, 431 F.3d at 1167.  We begin with the rule that no such hearing is
     required "[i]f the record refutes the applicant's factual allegations or otherwise precludes
5    habeas relief." *Landrigan*, 550 U.S. at 474; *see also Perez*, 459 F.3d at 950; see also
     Lambert, 393 F.3d at 965–66 (holding that an evidentiary hearing is not a prerequisite to
6    an adjudication on the merits triggering AEDPA deference). The ultimate question,
     however, is whether an appellate court would be unreasonable in holding that an
7    evidentiary hearing was not necessary in light of the state court record. *Taylor*, 366 F.3d at
     1000.
8

9    Hibbler, 693 F.3d at 1147–48.[6]

10           In the present case, if the record were simply the contrary positions of petitioner and

11   defense counsel, the court would order an evidentiary hearing to establish the existence of the

12   plea offer and any resultant prejudice caused by its rejection.  Although defense counsel relates

13   that no deal without a "life tail" was ever offered, counsel's records shed no light on plea deals at

14   all.  The undersigned finds it strange that none of the proffered deals were ever memorialized in

15   the file.  However, the prosecutor involved has filed a declaration under penalty of perjury also

16   declaring the non-existence of the plea agreement petitioner believes defense counsel discussed

17   with him.  Petitioner has demonstrated no way of attacking the credibility of the prosecutor; the

18   record is bereft of any evidence which could be utilized to impeach the prosecutor.  The *sine qua*

19   *non* for a plea agreement is the fact of its having been offered by the prosecution.  No matter what

20   petitioner heard from defense counsel, or thought he heard, the fact is that no plea agreement for

21   21 years, or any amount of years proximate thereto, was ever offered by the prosecution.

22           Given the prosecutor's declaration, and the lack of evidence or means to impeach it, the

23   court finds no evidentiary hearing necessary as the record clearly rejects petitioner's contentions

24   [6]  The undersigned is aware of Hurles v. Ryan, 752 F.3d 768 (9th Cir.2014) (If a state court
     makes factual findings without an opportunity for the petitioner to present evidence, the fact-
25   finding process is deficient and the state court opinion is not entitled to deference.), petition for
     cert. filed, 82 USLW 3009 (Jun. 17, 2013).  To the extent that Hurles imposes a per se bar to a
26   state court's credibility finding without an evidentiary hearing, it is inconsistent with Hibbert (not
     cited in the Hurles majority opinion); the undersigned will follow the earlier Ninth Circuit case.
27   Moreover, petitioner's sole evidence herein was his recounting of a discussion with defense
     counsel, and this evidence was presented to the state court.
28
                                                     24

1  of the existence of such a plea offer. This finding precludes a necessity to discuss the asserted

2  prejudice suffered by petitioner when he rejected such a [non-existent] plea offer based on his

3  counsel's advice. This claim of ineffective assistance of trial counsel should be rejected.

4  *Conclusion*

5          Accordingly, IT IS HEREBY RECOMMENDED that:

6          1.  The habeas corpus petition, and its supplement in this case be denied; and

7          2.  The District Court decline to issue a certificate of appealability.  Although petitioner's

8  ineffective assistance of appellate counsel claim ("kill-zone" jury instruction) under state law is

9  colorable, it does not warrant granting a certificate of appealability as viewed through the

10 AEDPA federal claim standard of review because of the improbability of prejudice.

11         These findings and recommendations are submitted to the United States District Judge

12 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

13 after being served with these findings and recommendations, any party may file written

14 objections with the court and serve a copy on all parties.  Such a document should be captioned

15 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16 shall be served and filed within fourteen days after service of the objections.  The parties are

17 advised that failure to file objections within the specified time may waive the right to appeal the

18 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19         IT IS HEREBY ORDERED that Petitioner's request for an evidentiary hearing is denied.

20 Dated: June 29, 2015

21                              /s/ Gregory G. Hollows
                         UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28